IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| MICHAEL MCGOWAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 14-CV-14-NJR-DGW |
| | ) | |
| ROBERT SHEARING, | ) | |
| ILLINOIS DEPARTMENT OF | ) | |
| CORRECTIONS, | ) | |
| WEXFORD HEALTH SERVICES, INC., | ) | |
| and ANGELA CRAIN, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Plaintiff Michael McGowan is an above-the-knee amputee and an inmate in the custody of the Illinois Department of Corrections ("IDOC") at Menard Correctional Center ("Menard"). He filed this lawsuit alleging that he was housed in a cell that was not handicap accessible and denied a useable prosthetic leg or any other assistive device. Following a threshold review of his original complaint, he was permitted to proceed against Dr. Robert Shearing, the Medical Director at Menard, for deliberate indifference and retaliation in violation of the Eighth Amendment (Doc. 6). He also was permitted to proceed against the IDOC for violating the Americans with Disabilities Act and the Rehabilitation Act (Doc. 6). He later amended his complaint to add claims of deliberate indifference and retaliation against Angela Crain, the Director of Nursing at Menard, and claims of deliberate indifference against the IDOC and Wexford Health Services, Inc.

("Wexford") (Doc. 67).

This matter is currently before the Court on the motion filed by Dr. Shearing and Wexford seeking summary judgment on Plaintiff's claims of retaliation and deliberate indifference (Doc. 114). Also before the Court is Plaintiff's request that the Court defer ruling on the motion for summary judgment until additional discovery materials are provided to him (*see* Docs. 149, 152), as well as Plaintiff's motion to supplement his response to the motion for summary judgment with the additional discovery materials that he apparently obtained for himself (Doc. 170). The Court has carefully considered the briefs and all of the evidence submitted by the parties, and for the reasons set forth below, Defendants' motion for summary judgment is granted in part and denied in part, and both of Plaintiff's other requests are denied.

## BACKGROUND

Plaintiff's left leg was amputated above the knee in 1987, and he began using a prosthetic leg a couple years later (Doc. 115-1, p. 4). He was incarcerated in 1991 but not housed at Menard until 2006 (Doc. 115-1, p. 6). The medical records indicate that he had issues with his prosthetic leg as early as 2007 (Doc. 152-1, pp. 4–13). But his complaints really began in earnest in September 2010, when he complained that his prosthetic leg had not fit properly for the last nine months (*Id.* at p. 6). He was referred to the Medical Director for an evaluation of his prosthesis (*Id.*), but there is no evidence that he ever saw the Medical Director. Ten months later, in July 2011, Plaintiff placed a sick call and again complained of back pain and problems with his prosthetic leg (Doc. 152-1, pp. 5, 11). The Certified Medical Technician ("CMT") noted that there was a "noticeable" difference in

the length of Plaintiff's prosthetic leg compared to his real leg and referred Plaintiff to the physician (*Id.* at p. 5). Plaintiff saw a physician in August 2011 and another physician in September 2011; each time he was given pain medication, but his prosthetic leg was not evaluated (*Id.* at pp. 9, 10).

Another seven months went by, and Plaintiff was still complaining that his prosthetic leg did not fit properly and that he was in constant pain despite taking the over-the-counter pain medications (Doc. 152-1, p. 11). The CMT noted that there were no indications in the medical record that Plaintiff's issues with his prosthetic leg had been addressed (*Id.*). Once again, Plaintiff was referred to the Medical Director for an evaluation of his prosthetic leg (*Id.*). Four days later, on May 3, 2012, Dr. Samuel Nwaobasi saw Plaintiff to discuss the problems with his prosthetic leg and his back brace (*Id.* at p. 12). Plaintiff's permit for his back brace was renewed, but nothing was done about his prosthetic leg (*see id.*) At the end of the month, the CMT once again noted that Plaintiff's problems with his prosthetic leg still had not been addressed, and Plaintiff was referred to the Medical Director (*Id.* at p. 13).

Finally, on June 15, 2012, Dr. John Shepherd requested approval to refer Plaintiff to the Hanger Clinic for an evaluation of his prosthetic leg (Doc. 115-6, p. 11). That request was approved by Wexford two weeks later (*Id.* at p. 12). Following the approval, the prison moved Plaintiff to the South Lower cell house in Cell 141 while he waited for his new prosthetic leg (Doc. 115-4; Doc. 115-1, p. 9). Inmates with medical conditions are typically housed in the South Lower because of its close proximity to the dining room and showers (Doc. 115-6, p. 18). At the time Plaintiff was moved to his new cell in the

South Lower, his prosthetic leg was taken from him (Doc. 115-1, p. 9). His cellmate was another amputee named Kenneth Calhoun; Mr. Calhoun was also left in the cell without a prosthetic leg while he was waiting to receive a new one (*Id.*).

Plaintiff was in his cell without a prosthetic leg for nearly a month before his evaluation at the Hanger Clinic on August 6, 2012 (*see* Doc. 115-2, pp. 28–32). The Hanger Clinic noted that Plaintiff's prosthetic leg was fourteen years old (*Id.*). It had a broken foot that Plaintiff taped together (*Id.*). The knee was not functioning (*Id.*). It had an ill-fitting socket (*Id.*). The belt needed to suspend the leg was missing (*Id.*). The Hanger Clinic determined that the prosthetic leg was irreparably damaged and needed to be replaced (*Id.*).

In late September 2012, Plaintiff received a new prosthetic leg (Doc. 115-2, p. 23; Doc. 115-1, p. 13). Shortly after receiving the new device, he began complaining to the medical staff that his new prosthesis was too long (Docs. 115-1, p. 13; 115-5, p. 24). The medical records indicate that on October 10, 2012, a CMT noted that Plaintiff's complaint appeared to be true (Doc. 115-5, p. 24). The CMT told Plaintiff that he would be referred to the Medical Director (*Id.*; Doc. 149-8). The next day, an appointment with the Hanger Clinic was approved (Doc. 115-5, p. 24), however, there is no indication when that appointment was scheduled or for what date it was scheduled. Additionally, it does not appear that anyone informed Plaintiff what was going on because on October 13, 2012, he filed a grievance, complaining in part that his new prosthetic was too long and was causing back problems (Doc. 115-8, p. 5). He said he could not "even walk to the chow hall without being in tremendous back pain" (*Id.*). In the grievance, he claims that he

wrote to Gail Walls and dropped sick call requests, but he had not received any responses (*Id.*).

Dr. Shearing became the Medical Director at Menard on October 15, 2012, and Plaintiff's complaints continued (Doc. 115-3, p. 1). On November 5th, Plaintiff stopped Lieutenant J. Mich as he was walking around the gallery (Doc. 149-8, pp. 12–13; Doc. 149-4, p. 1). Plaintiff asked him if he could help him get his old prosthesis back from the Health Care Unit (Doc. 149-8). Plaintiff explained that he had a new prosthesis, but it was causing him a lot of pain (*Id.*). Plaintiff also told Lieutenant Mich that he had written to the Medical Director and the Nursing Supervisor, but had not gotten any response (*Id.*).[1] Lieutenant Mich sent Plaintiff a written response later that same day explaining that he had passed Plaintiff's info along to the Health Care Unit ("HCU") administrator and that Plaintiff would be getting a call pass soon (Doc. 149-4, p. 1). There is no evidence that he was called into the HCU, but Plaintiff was given his old prosthesis (*see* Docs. 115-6, 115-7; 149-8). The old prosthesis broke, however, when Plaintiff was trying to put it on, so he was unable to wear it (Doc. 149-8).

On November 13, 2012, Plaintiff went to the Hanger Clinic (Doc. 115-2, pp. 19, 20). According to Plaintiff, he had both his old and new prosthetic legs with him; he claims he gave his old prosthesis to the Clinic to throw away or use for parts because it was useless to him (Doc. 149-8).[2] As for the new prosthesis, the practitioner who saw

[1] There is mention of an emergency grievance that was filed by Plaintiff in November 2012 about his prosthetic leg (*see* Doc. 115-8, p. 6). The actual grievance is not part of the record, however. It was apparently determined that the grievance was not an emergency, and it was returned to him at some point, but he did not forward it for review through the normal grievance process (Doc. 115-8, p. 6).

[2] According to Plaintiff's affidavit, he took his old prosthetic to the Hanger Clinic on November 13, 2012 (Doc. 149-8). At his earlier deposition, however, he was unable to recall exactly when he took his old leg in (Doc. 115-1, pp. 18–19). He initially thought it might have been in April 2013, but then he reasoned that

Plaintiff noted that it was difficult for Plaintiff "to clear the floor," he was "vaulting," and he was having back pain (Doc. 115-2, p. 19). In an attempt to fix those problems, the leg was shortened by half an inch (*Id.*). The medical records indicate that after the modification Plaintiff's gait was normal, and he was satisfied with the fit and function of his prosthesis (*Id.* at pp. 19, 20).

One week after Plaintiff's leg was shortened, on November 21, 2012, he was prescribed a thirty-day supply of Tylenol 325mg (Doc. 115-6, p. 31; Doc. 115-3, p. 4). This prescription was for pain that Plaintiff was experiencing in his right shoulder (Doc. 115-5, p. 27). According to Plaintiff, it did nothing to alleviate his back pain (*see* Doc. 115-1, pp. 31–32; Doc. 149-8). He continued having back pain and problems with his prosthesis, and on December 25, 2012, he wrote a letter to Dr. Shearing (*see* Doc. 149-3, p. 10).[3] He also placed a nurse sick call on January 4, 2013, and complained of trouble with his prosthesis (Doc. 115-5, p. 30). He was referred to Dr. Shearing (*Id.*).

On January 9, 2013, Dr. Shearing responded to Plaintiff's letter, stating:

> You recently received a brand new prosthetic leg. It is rare that a prosthetic leg feels entirely satisfactory, especially right at first. In general, the more you use the prosthetic leg, the more quickly you will adjust to its unique characteristics and the less its shortcomings are likely to bother you. Although lockdowns are frequent in maximum security prison, you are free to walk with the prosthetic leg and do exercises inside the cell and I encourage you to do so.

(Doc. 149-3, p. 10). Two days later, Dr. Shearing saw Plaintiff about his prosthetic leg

---

was not possible because he did not go into the Clinic that month (*Id.*; *see* Doc. 115-2). It also cannot be true because the Clinic had the old prosthesis in its possession by March 2013, when it dismantled the old leg to put its knee joint in the new leg (Docs. 115-1, p. 18; Doc. 115-2, p. 4). And there is no evidence that the Clinic reassembled the old prosthetic leg and sent it back to the prison with the correctional officers. Thus, it appears that the timeline in Plaintiff's affidavit is the only one that actually works with all of the other facts in the record.

[3] The letter itself is not part of the record.

(Doc. 115-5, p. 30). Plaintiff states that he told Dr. Shearing the leg was making a loud noise and leaking oil, and if the knee unit was not properly oiled, it would lock up (Doc. 115-1, p. 16; 115-8, p. 6; Doc. 194-8). He also told Dr. Shearing that the prosthetic leg was still under warranty so the issue could be fixed at no cost ((Doc. 115-1, p. 16). Plaintiff states that Dr. Shearing's response was something to the effect of "this is jail. Deal with it." (*see* Doc. 115-8, p. 6; Doc. 149-8).

Dr. Shearing's story, of course, is very different. He indicated in the medical record that "I cannot find any evidence that the prosthesis is malfunctioning in any way or is improperly sized" (Doc. 115-5, p. 30). Dr. Shearing says he told Plaintiff "to attempt to work with the new prosthesis for at least another week before jumping to the conclusion the prosthesis was malfunctioning (Doc. 115-3). It is undisputed that McGowan did not receive any pain medication or the back x-ray that he requested at this visit. Plaintiff filed a grievance the same day of his appointment asking to be transferred to an institution that could meet his needs and to have his prosthetic properly fixed (*see* Doc. 115-8, p. 6). He filed another grievance on February 11, 2013 (*see* Doc. 115-10, p. 5).

The prosthetic leg eventually locked up as Plaintiff said it would, and on March 3, 2013, an appointment was made for him at the Hanger Clinic (Doc. 115-1, p. 16; Doc. 115-5, p. 31). He was seen four days later, and the Clinic determined that oil was leaking from the hydraulic knee causing the prosthetic to lock up and not bend (Doc. 115-1, p. 16; Doc. 115-2, p. 4). The Hanger Clinic was unable to repair the knee unit on site, and it had to be sent to the manufacturer (Doc. 115-2, p. 4). Plaintiff was unwilling to return to Menard without the prosthesis, however, because he would be completely immobile

without it since he was not allowed to have a cane, crutches, or a wheelchair (Doc. 115-1, p. 18; Doc. 115-2, p. 4; Doc. 149-8). The Clinic provided a temporary fix by taking the knee unit from his old prosthetic leg (which they apparently still had at the Clinic) and placing it in the new prosthetic leg while he waited for the repaired knee unit to arrive (Docs. 115-1, p. 18; Doc. 115-2, p. 4). On March 26, 2013, the new prosthetic leg was taken back to the Hanger Clinic, the new knee unit was installed, and it appears that the prosthesis was returned to Plaintiff the same day (Docs. 115-2, p. 4; 115-3, pp. 2–3).

When Plaintiff received the prosthesis, however, he discovered that it was missing a button/valve, which made it impossible for him to put the prosthetic on (Docs. 115-1, p. 18; 115-2 pp. 14–15). The correctional officers took the prosthesis back to the Health Care Unit where someone called the Hanger Clinic to ask about the valve (Doc. 115-1, p. 18; Doc. 149, pp. 13–14). The valve could not be located, so another one had to be ordered (*Id.*). In the meantime, Plaintiff was in his cell without his prosthesis, a cane, crutches, or a wheelchair.[4] He claims that he waited to receive a medical lay-in permit, but it never came (Doc. 149-8). He further claims that he was never given any information as to how long he would be without his prosthesis (Doc. 149-8). So he started filing more grievances, but he did not receive any responses (Doc. 149-8; *see also* Doc. 115-9, p. 8).

It is unclear when Plaintiff got his prosthetic leg back.[5]  At his deposition, Plaintiff testified that he was without his leg for a week or a week and a half (Doc. 115-1, pp. 18–

---

[4] Defendants assert that Plaintiff had his old prosthesis, but they do not cite to any evidence to support that assertion (Doc. 115, p. 4). Additionally, a close examination of the record reveals that Plaintiff could not have had his old prosthesis. *See* note 2 above.

[5] Defendants assert that Plaintiff's prosthetic leg was returned to him on October 24, 2013 (Doc. 115, p. 5). But once again, they do not cite to any evidence to support that assertion (*see id.*).

19). In a subsequent affidavit, however, he said he got his leg back on April 28, 2013 (Doc. 149-8). The medical records do not provide a clear answer. The records show that approval from Wexford was received on April 1, 2013, for an outpatient visit to the Hanger Clinic to have the broken valve repaired (Doc. 115-6, p. 14). It does not appear, however, that an appointment was ever made (*see* Docs. 115-2, 115-5, 115-6). Instead, as best the Court can tell, the Hanger Clinic shipped the valve to Menard on April 7, 2013 (*see* Doc. 115-2, pp. 15–16). Plaintiff was then seen by Dr. Shearing on April 30, 2013, and it was noted that the problems with the prosthesis were resolved by the Hanger Clinic. Plaintiff had no complaints at that time (Doc. 115-5, p. 33).

By August 2013, Plaintiff was having problems with his prosthetic leg again. He saw Dr. Shearing on August 2, 2013, complaining that the knee unit was not functioning properly and was catching as he walked (Doc. 115-3, p. 3). Plaintiff explained that while he was walking the leg would bend at the knee but then it would not "come back," meaning it would not return to the extended position quickly enough (Docs. 115-1, p. 19; 115-2, p. 3). Plaintiff said he had to walk stiff-legged in order to prevent the leg from bending (Doc. 115-1, p. 19). Dr. Shearing requested approval for a visit to the Hanger Clinic, and it was approved by Wexford within two weeks (Doc. 115-2, p. 12; Doc. 115-6, pp. 15–16). Plaintiff was scheduled for an appointment at the Hanger Clinic on September 10 (*see* Doc. 115-2, p. 12; Doc. 115-6, pp. 15–16). At the appointment, it was determined that the knee unit needed to be replaced again (Docs. 115-2, p. 13; 115-3, p. 3; 115-5, p. 39). Plaintiff returned to Menard with the prosthesis while he waited for the replacement part to arrive (Doc. 115-2, p. 13).

Approximately a month and a half later, on October 21, 2013, the prosthesis was taken to the Hanger Clinic so that the knee unit could be replaced (Docs. 115-3, p. 3; 115-5, p. 42). Plaintiff was taken to the Health Care Unit where he was supposed to stay until the leg was returned (Doc. 115-5, p. 42). Unfortunately, however, he was returned to his cell the following day in a wheelchair with a medical lay-in permit, but without a mode of transportation or an assistive device (Doc. 115-5, p. 43; Doc. 115-10, p. 20). The guards picked up the prosthetic leg from the Hanger Clinic on October 28th, and it was returned to Plaintiff on October 29th (Docs. 115-2, p. 3; 115-5, p. 43). The medical records indicate that Plaintiff had no complaints with the fit of the prosthesis (Doc. 115-5, p. 43).

As noted above, Dr. Shearing left Menard on November 16, 2013. A short time later, Plaintiff underwent an x-ray of his back that showed a narrowing of discs and subchondral sclerosis (Doc. 115-3).

## DISCUSSION

### I.   REQUEST TO DEFER RULING ON MOTION FOR SUMMARY JUDGMENT

The Court will first address Plaintiff's request to defer ruling on the motion for judgment. Plaintiff argues that he was not provided various discovery materials by Dr. Shearing and Wexford and thus a ruling on the Motion for Summary Judgment should be stayed pending production of that discovery (Doc. 152, pp. 4–5).[6] Defendants

---

[6] In their reply brief (Doc. 153), Defendants argue that pages 21 through 51 of Plaintiff's response should be stricken because Local Rule 7.1 only allows for 20 page briefs. In light of Plaintiff's *pro se* status, the handwritten response, and Plaintiff's repetition of portions of Defendants' brief, the Court will consider the entirety of Plaintiff's brief. Defendants also argue that certain exhibits attached to the response were responsive to discovery requests but were not produced. While perhaps Plaintiff did not respond adequately to discovery requests, the oversights are harmless. Defendants should have and did have access to Plaintiff's medical records; the medical literature cited does not appear directly relevant to Plaintiff's claims; and IDOC policies are also only marginally related to Plaintiff's claims against these Defendants.

disagree and argue that discovery as it relates to them was not extended or permitted, and Plaintiff did not seek any relief regarding discovery in his previous two motions for extension of time (Doc. 154, citing Docs. 117 and 131). The Court further notes that Plaintiff did not seek any additional discovery against these Defendants in a hearing held on June 9, 2015.

Federal Rule of Civil Procedure 56(d) provides that: "If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may . . . defer considering the motion or deny it." The burden is on the Plaintiff to "identify material facts needed to oppose summary judgment." *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 628 (7th Cir. 2014). In his responses to the Motion for Summary Judgment, Plaintiff states that he requested various contracts, manuals, codes, and directives (to which Wexford is either a party to or has access to) and that the discovery process is not yet "complete" because Defendants have withheld necessary documents (Doc. 152, pp. 4–5). To support his request to defer ruling on the motion for summary judgment pending more discovery, Plaintiff offers a generic affidavit identifying the documents that he requires in general (Doc. 152-3), but he does not provide specific details as to why or how these documents would support a material fact. Plaintiff has failed to meet his burden.

Additionally, a review of the record in this case reveals that discovery was completed and that Defendants have not unjustifiably withheld documents responsive to a discovery request. As indicated in Defendant's response (Doc. 154), discovery in this matter closed on January 30, 2015 (Doc. 29). After a hearing was held on February 5,

2015, an Order was entered noting that Defendant Wexford was directed to serve responses to discovery requests served on January 8, 2015, and that Plaintiff was permitted to seek admissions (Doc. 126). Another status conference was set for June 9, 2015, and the parties were directed to "be prepared to discuss any outstanding discovery disputes" (*Id.*). The transcript from the status conference is not part of the record, but an Order entered following the hearing is telling in that it did not discuss any additional discovery that Plaintiff wanted to seek as to the moving Defendants (Doc. 148). And neither of Plaintiff's Motions for Extension of time to respond to the Motion for Summary Judgment (Docs. 117 and 131) indicated that he was awaiting discovery responses. A *pro se* party is given some leeway in proceeding in Federal Court, but Plaintiff is still required to follow the Federal Rules. *See McNeil v. United States*, 508 U.S. 106, 113 (1993). Throughout this litigation, Plaintiff has demonstrated an ability to follow the Federal Rules and seek appropriate relief. That Plaintiff has only now complained of the lack of evidence, after being given multiple opportunities to address discovery, will not delay consideration of the pending motion on the merits.

## II. MOTION TO SUPPLEMENT RESPONSE TO MOTION FOR SUMMARY JUDGMENT (DOC. 170)

Plaintiff apparently obtained the discovery materials discussed above through his own "independent research," and he wants to supplement his response in opposition to Defendants' motion for summary judgment with those materials. In particular, Plaintiff submitted (1) a 2011 contract between the IDOC and Wexford, (2) IDOC Administrative Directive 04.03.103 regarding inmate health care services, (3) Menard's Institutional Directive regarding inmate health care services, (4) a 2013 internal audit of the Health

Care Unit at Menard, an excerpt from Adult Correctional Institutions, Third Edition, and (5) Wexford's Orthopedic Surgery Guidelines.

Plaintiff did not indicate where or how he obtained the documents. He also did not explain why they are important or what he believes they tend to show, and an answer to either question is not readily apparent from the face of the documents. In fact, some of them appear to be wholly irrelevant to the matter at hand. As previously explained, Plaintiff failed to address his concerns regarding discovery in a timely manner. The Court will not allow him to sidestep the discovery process and submit unauthenticated and irrelevant documents that he somehow obtained for himself. The motion is denied.

III.   MOTION FOR SUMMARY JUDGMENT

A.  Legal Standard for Summary Judgment

The standard applied to summary judgment motions under Federal Rule of Civil Procedure 56 is well-settled and has been succinctly stated as follows:

> Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. In determining whether a genuine issue of material fact exists, [the Court] must view the record in a light most favorable to the nonmoving party. Because the primary purpose of summary judgment is to isolate and dispose of factually unsupported claims, the nonmovant may not rest on the pleadings but must respond, with affidavits or otherwise, setting forth specific facts showing that there is a genuine issue for trial . . . . A mere scintilla of evidence in support of the nonmovant's position is insufficient; a party will be successful in opposing summary judgment only when it presents definite, competent evidence to rebut the motion.

*Albiero v. City of Kankakee*, 246 F.3d 927, 931-32 (7th Cir. 2001) (citations and quotations omitted). No issue remains for trial "unless there is sufficient evidence favoring the

non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted).

### B. Deliberate Indifference Against Dr. Shearing re: Conditions of Confinement

In Count 1, Plaintiff alleges that Dr. Shearing was deliberately indifferent in violation of the Eighth Amendment when he left Plaintiff in a cell that was not equipped for his handicap and when he refused to give him an assistive device (Doc. 67). The Court believes this claim is best characterized as one challenging the conditions of Plaintiff's confinement. Prison officials violate the Eighth Amendment "if they are deliberately indifferent to adverse conditions that deny 'the minimal civilized measure of life's necessities,' such as adequate food, clothing, shelter, recreation, and medical care." *Budd v. Motley*, 711 F.3d 840, 842 (7th Cir. 2013) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). To succeed on a claim of deliberate indifference to a condition of confinement, a prisoner must show that a prison official knew of a prison condition that presented an objective, sufficiently serious risk of harm, yet disregarded that risk by failing to take reasonable measures to address it. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014); *Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008).

Dr. Shearing makes no argument regarding the first prong of the deliberate indifference analysis—an objective, sufficiently serious condition that presented a substantial risk of harm if left unaddressed (*see* Doc. 115). And it is quite obvious that leaving a one-legged man in a prison cell with nothing to help him get around could easily result in physical harm or hazardous conditions of confinement. The things that

immediately come to mind are an inability to use the toilet, to get to the shower, to obtain meals, to obtain suitable recreation and exercise, and of course, the falls and injuries that may occur as a result of the amputee trying to secure those basic needs.

Thus, the issue presented by the summary judgment motion is whether the Dr. Shearing acted with deliberate indifference. While Dr. Shearing discusses his actions with respect to Plaintiff during his entire tenure as Medical Director at Menard (*see* Doc. 115, pp. 10–13), the Court's primary focus is on the times that Plaintiff was left in his cell without his prosthetic leg. Dr. Shearing admits that, while he was the Medical Director at Menard, there were at least two periods of time where Plaintiff was without his leg: (1) beginning March 26, 2013, and lasting for some period of time less than one month when his prosthesis was missing a valve, and (2) for nine days in October 2013 when the knee unit was being replaced.

With respect to the incident that occurred during March and April 2013, Dr. Shearing knew that Plaintiff did not have his new prosthetic leg.[7] Dr. Shearing asserts, however, that Plaintiff "was accommodated with his old prosthesis while the repairs were made to the new one." (Doc. 115, p. 12). He also acknowledges that the old one malfunctioned at some point, and Plaintiff was completely without a functional prosthesis for some period of time, but he claims he was never aware of that (Doc. 115, pp. 4–5).

Whether Plaintiff had his old prosthetic leg is a disputed issue of fact. *See supra*

---

[7] Dr. **Shearing** makes no suggestion or argument to the contrary (*see* Doc. 115). Furthermore, the medical records show that Dr. Shearing sought, and was granted, approval to take the leg to the Hanger Clinic to have the broken valve repaired (Doc. 115-6, p. 14). Because Dr. Shearing knew the prosthesis was missing a necessary valve, it can be inferred that he knew that Plaintiff was unable to use the leg.

n.2, 4. But even if Plaintiff did have his old prosthetic leg, a jury could conclude that was not a reasonable measure to address the hazards Plaintiff faced. The old prosthetic leg had a broken foot and an ill-fitting socket, and it was missing the belt needed to keep the leg attached. And there is evidence that the ill-fitting and deteriorated prosthesis caused Plaintiff to suffer severe pain and impaired his ability to walk. In other words, Plaintiff was in the same, if not a worse, position with his old prosthetic leg as he was without a leg at all. Simply put, Dr. Shearing was aware that Plaintiff did not have his new prosthetic leg, but there is nothing that suggests he took any action to ensure that Plaintiff was able to move about his cell or the prison. Viewing the evidence in the light most favorable to the Plaintiffs, a jury could find Dr. Shearing was deliberately indifferent to Plaintiff's conditions of confinement with respect to the March/April 2013 incident.

With respect to the incident in October 2013, Plaintiff was housed in the Health Care Unit the first day and then returned to his cell. Dr. Shearing provided him with a medical lay-in permit until October 29th when he received his leg back (Doc. 115, p. 12). It is undisputed that Plaintiff did not have a mode of transportation or assistive device in his cell from the time he was taken back to his cell on October 22nd until the time he received his leg on the 29th (*see* Doc. 115-10, p. 7). In other words, Dr. Shearing ensured that Plaintiff received his meals, but he did nothing to ensure that Plaintiff could move around his cell, access the toilet, or get to the shower. Again, viewing the evidence in the light most favorable to Plaintiff, a jury could find Dr. Shearing was deliberately indifferent to Plaintiff's conditions of confinement with respect to the October 2013

incident.

Defendants argue that even if Dr. Shearing was deliberately indifferent to Plaintiff's housing and assistive device needs, he is still entitled to summary judgment because there was no resulting harm (Doc. 115, p. 13). That is incorrect. If Plaintiff did not suffer a physical injury as a result of Dr. Shearing's deliberate indifference, he cannot collect compensatory damages; but he may still be eligible for nominal or punitive damages. *See Thomas v. Illinois*, 697F.3d 612, 614–15 (7th Cir. 2012) (explaining that nominal and punitive damages are available due to "hazard, or probabilistic harm" even in absence of physical or psychological harm); *Smith v. Peters*, 631 F.3d 418, 421 (7th Cir. 2011) ("Prison officials who recklessly expose a prisoner to a substantial risk of a serious physical injury violate his Eighth Amendment rights, [and may be liable for] nominal and . . . punitive damages."); *Calhoun v. DeTella*, 319 F.3d 936, 941–42 (7th Cir. 2003) ("[W]e have approved the award of nominal [and punitive] damages for Eighth Amendment violations when prisoners could not establish actual compensable harm.").

In sum, Dr. Shearing's request for summary judgment on Count 1 is denied.

### C. Deliberate Indifference Against Dr. Shearing re: Medical Care

In Count 3, Plaintiff claims that Dr. Shearing was deliberately indifferent to Plaintiff's serious medical needs when he failed to timely respond to complaints about Plaintiff's new prosthesis, failed to diagnose the cause of his back pain, and failed to adequately treat his pain.

In order to prevail on a claim for deliberate indifference to a medical need, a prisoner must show that a prison official knew that a medical condition posed a serious

risk to the prisoner's health yet responded ineffectually or not at all. *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012). In the context of medical professionals, this standard also has been described as the 'professional judgment' standard." *Sain v. Wood*, 512 F.3d 886, 894 (7th Cir. 2008). This means in order for a prison medical professional to be held liable for deliberate indifference, his or her treatment decisions must be "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Sain*, 512 F.3d at 895. In other words, a prison medical professional is "entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances." *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (quoting *Sain*, 512 F.3d at 894–95).

Here it is indisputable that while Dr. Shearing was the Medical Director at Menard, he evaluated Plaintiff on a number of occasions and sent him for evaluations with specialists at the Hanger Clinic multiple times. But the fact that Plaintiff received *some* medical attention does not foreclose his deliberate indifference claim. *Gonzalez v. Feinerman*, 663 F.3d 311, 314 (7th Cir. 2011). He can still prevail if Dr. Shearing's response was blatantly inappropriate in the face of his pain. *Id.* In this instance, the Court believes a reasonable jury could reach that conclusion.

According to Plaintiff, he complained of severe back pain from the time Dr. Shearing started at Menard until the time he left.[8] Dr. Shearing acknowledges in his affidavit that Plaintiff was suffering back pain (*see* Doc. 115-3, p. 4 ("I believed the cause

---

[8] At his deposition, Plaintiff described his pain as a "ball of fire burning in my back" and said he "really couldn't function" (Doc. 115-1, pp. 13, 27).

of Plaintiff's back pain might well be the misfitting and/or malfunctioning prosthesis . . . .")). Yet he admits that during the thirteen months he was at Menard, he prescribed pain medication (Tylenol) to Plaintiff on only one occasion (*see* Doc. 115-3, p. 4). Viewing these facts in a light most favorable to Plaintiff, a reasonable jury could find that Dr. Shearing was deliberately indifferent because, although he repeatedly arranged for Plaintiff's prosthetic leg to be repaired, he did nothing to abate Plaintiff's pain in the interim. *See Smith v. Knox Cnty. Jail,* 666 F.3d 1037, 1040 (7th Cir. 2012) ("Even a few days' delay in addressing a severely painful but readily treatable condition suffices to state a claim of deliberate indifference."); *McGowan v. Hulick,* 612 F.3d 636, 640 (7th Cir. 2010) ("A delay in treatment may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain.").

As such, Dr. Shearing's request for summary judgment on Count 3 is denied.

### D. Deliberate Indifference Against Wexford

In Count 6, Plaintiff claims that Wexford, as a corporation, was deliberately indifferent to his serious medical needs between July 2012 and the time the amended complaint was filed on October 31, 2014 (Doc. 67; Doc. 68). Under controlling precedent, a private corporation that contracts to provide essential government services can be held liable under § 1983, but not under a theory of *respondeat superior. Shields v. Ill. Dep't of Corr.,* 746 F.3d 782, 789 (7th Cir. 2014), *cert. denied,* 135 S. Ct. 1024 (2015). The corporation can only be held liable if "the constitutional violation was caused by an unconstitutional policy or custom of the corporation itself." *Id.; see also Monell v. Dep't of Social Serv. of N.Y.C.,* 436 U.S. 658 (1978). Therefore, in order to recover against Wexford, Plaintiff must

offer evidence that "his injury was caused by a Wexford policy, custom, or practice of deliberate indifference to medical needs, or a series of bad acts that together raise the inference of such a policy." *Shields*, 746 F.3d at 796.

Plaintiff argues that Wexford has express policies that "violate . . . the Rehabilitation Act . . . and the Americans with Disabilities Act" (Doc. 149-2, p. 6). He does not, however, identify what those policies are or explain how they are unconstitutional.

Plaintiff also argues that Wexford was deliberately indifferent because it failed to properly train its employees and or ensure they followed proper procedures when evaluating and treating inmates who wore prosthetics (Doc. 149-2, pp. 7–10). Plaintiff also argues that Wexford was deliberately indifferent because it failed to properly train its employees and/or ensure they followed proper procedures when evaluating and treating inmates who wore prosthetics (Doc. 149-2, pp. 7–10). For nearly two years, between September 2010 and June 2012, at least three doctors flat-out ignored Plaintiff's complaints that his prosthetic leg was ill-fitting and malfunctioning. Additionally, Plaintiff was left in his cell without an assistive device on three occasions over the course of approximately a year and a half, and so was his cellmate--on at least one occasion. Thus, Plaintiff has presented enough evidence of a series of bad acts that a reasonable jury could conclude that the treatment of amputees was wholly inadequate. There is simply no evidence, however, that Wexford was the "moving force" behind that inadequate treatment. *Wilson v. Cook Cnty.*, 742 F.3d 775, 779 (7th Cir. 2014) (quoting *Teesdale v. City of Chicago,* 690 F.3d 829, 833 (7th Cir. 2012)).

For example, Plaintiff did not put forth any evidence of deficiencies in, or a complete lack of, Wexford's procedures for dealing with inmates with prosthetic limbs. He also did not put forth any evidence showing that Wexford inadequately trained or failed to supervise its medical providers. *Cf. Woodward v. Corr. Med. Serv. of Ill.*, 368 F.3d 917 (7th Cir. 2004) (finding evidence of inadequate training where nurses never completed orientation program, never reviewed instructional videos, and never read manual); *Quinn v. Hardy*, No. 11-CV-1173, 2015 WL 1119409, at *8 (N.D. Ill. Mar. 10, 2015) (finding evidence of failure to supervise where Wexford did not conduct annual review of physician and peer review of physician identified a number of deficiencies that Wexford repeatedly refused to address). Furthermore, there is also no evidence that Wexford actually knew its employees were routinely providing inadequate care to Plaintiff but did nothing to stop it. *See Minix v. Canarecci*, 597 F.3d 824, 832 (7th Cir. 2010). And there were not so many instances that Wexford was "bound to have noticed what was going on." *Estate of Novack ex rel. Turbin v. Cnty of Wood*, 226 F.3d 525, 531 (7th Cir. 2000).

In other words, there does not appear to be any direct connection between Wexford's inadequate policies, training, or supervision to hold Wexford liable for the inadequate medical care that Plaintiff experienced. Accordingly, Wexford is entitled to summary judgment on Count 6 for deliberate indifference.

### E.  Retaliation Against Dr. Shearing

In Count 4, Plaintiff claims that Dr. Shearing delayed or failed to give him medical care in retaliation for his complaints. At the summary judgment stage, a prisoner has the

initial burden to make out a *prima facie* case of retaliation by showing that: "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation likely to deter such activity; and (3) the First Amendment activity was at least a motivating factor in the decision to impose the deprivation." *Hawkins v. Mitchell*, 756 F.3d 983, 996 (7th Cir. 2014) (citing *Thayer v. Chiczewski*, 705 F.3d 237, 251 (7th Cir. 2012)). The prisoner must "cite the facts which [he] believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim." *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015) (citations omitted). "If the movant has failed to make this initial showing, the court is obligated to deny the motion." *Id.* (citing *Johnson v. Hix Wrecker Serv., Inc.*, 651 F.3d 658, 662 (7th Cir. 2011) ("A party opposing summary judgment does not have to rebut factual propositions on which the movant bears the burden of proof and that the movant has not properly supported in the first instance.") and *Johnson v. Gudmundsson,* 35 F.3d 1104, 1112 (7th Cir. 1994) (even an unanswered motion for summary judgment cannot be granted unless the movant has shown that the facts warrant judgment in its favor)).

Plaintiff's response and his deposition testimony reveal that Plaintiff's retaliation claim is based on his subjective feelings and speculation rather than any actual evidence (*see* Doc. 115-1; Doc. 149). Plaintiff believes that Dr. Shearing was not interested in helping him, and that belief is based on Dr. Shearing's attitude ("a retaliatory mindset"), various statements (*e.g.*, that Plaintiff was a whiner), and his purported delay in getting Plaintiff's prosthesis fixed, his failure to offer Plaintiff pain medication, and his failure to

order an x-ray of Plaintiff's back. Plaintiff presented no evidence, however, that Dr. Shearing's actions were likely to deter him from filing grievances or seeking medical care. In fact, Plaintiff admitted that Dr. Shearing's actions did not succeed in doing either (Doc. 115-1, p. 37). Plaintiff also presented no evidence that his complaints and requests for medical care motivated Dr. Shearing's actions. While perhaps Dr. Shearing could have displayed a better bedside manner, taken more time to listen to Plaintiff's assessment of his prosthesis, and displayed some faith in that assessment, there is simply no evidence of retaliation.

Accordingly, Dr. Shearing is entitled to summary judgment on Count 4 for retaliation in violation of the Eighth Amendment.

## CONCLUSION

Plaintiff's motion for leave to supplement his response to Defendants' motion for summary judgment (Doc. 170) is **DENIED.** The Motion for Summary Judgment filed by Defendants Dr. Robert Shearing and Wexford Health Sources, Inc. (Doc. 114) is **GRANTED in part and DENIED in part**. Summary Judgment is **GRANTED** in favor of Dr. Robert Shearing on Count 4 and Wexford Health Sources, Inc. on Count 6. Summary Judgment is **DENIED** as to Dr. Robert Shearing on Counts 1 and 3.

The Counts that remain are:

Count 1: Dr. Robert Shearing and Nurse Angela Crain violated the Eighth Amendment when they left Plaintiff in a cell that was not equipped for his handicap and when they refused to give him an assistive device;

Count 2: The IDOC violated the American with Disabilities Act of 1990, 42 U.S.C.A. § 12101 et seq., and the Rehabilitation Act, 29 U.S.C. §§ 794-94e, with respect to the conditions of Plaintiff's cell and the denial of an assistive device;

Count 3: Dr. Robert Shearing and Nurse Angela Crain was deliberately indifferent to Plaintiff's serious medical needs in violation of the Eighth Amendment;

Count 4: Nurse Angela Crain retaliated against Plaintiff for his attempts to secure medical care and a properly equipped cell, in violation of the First Amendment; and

Count 5: The IDOC maintains unconstitutional policies and practices of deliberate indifference with respect to appropriate housing, accommodations, medical care and conditions of confinement for handicapped inmates.

Counsel will be recruited to represent Plaintiff at trial. A status conference for the purpose of setting firm dates for jury trial and a final pretrial conference will be scheduled once counsel enters an appearance.

**IT IS SO ORDERED.**

**DATED:   December 8, 2015**

**s/ Nancy J. Rosenstengel**
**NANCY J. ROSENSTENGEL**
**United States District Judge**